UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

        -v-                                Case No. 09-20523-09
                                                    Hon. Thomas L. Ludington

SALAH DADO,

                Defendant.

_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL**

This case officially began on October 28, 2009 when Rocky Corlew, Michael Szemites, and Cory Corlew were indicted for knowingly and intentionally manufacturing 1000 or more marijuana plants in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii) and 18 U.S.C. § 2. In January 2010, those Defendants moved to suppress some of the evidence that had been obtained against them. Subsequently a first superseding indictment was returned as to all three.

An evidentiary hearing commenced concerning the Defendants' motion to suppress on August 23, 2010, which was then continued to November 15, 2010. After testimony was heard from the three Defendants, a second superseding indictment was returned adding three more Defendants: David Howard, Christopher Threet, and Eric Schweikert. At that point, the Defendants begain to acknowledge their responsibility for their wrongdoing. The Corlews both pled guilty before Magistrate Judge Charles E. Binder on February 23, 2011 — Rocky to conspiracy to manufacturing 100 or more marijuana plants, and to possessing with intent to distribute, and to distribute 100 kg or more of marijuana; and Cory to knowingly using, renting or maintaining a house for purposes of manufacturing, using or distributing marijuana, and with aiding and abetting her husband in such conduct. *See* R. Corlew Plea Agreement, ECF No. 142;

C. Corlew Plea Agreement, ECF No. 141.  Michael Szemites pled guilty two days later to conspiracy to manufacture 1000 or more marijuana plants, and to possess with intent to distribute, and to distribute 1000 kilograms or more of marijuana.  *See* M. Szemites Plea Agreement, ECF No. 147.

A third superseding indictment was returned on March 23, 2011 charging David Howard, Christopher Threet, and Eric Schweikert with eleven counts of criminal misconduct related to the marijuana growing operation.  Finally, a fourth superseding indictment was returned on May 13, 2011 — with three additional Defendants: Timothy Bunting, Nathan Stover, and Salah Dado. By January 2012, Eric Schweikert, Nathan Stover, Timothy Bunting, David Howard, and Christopher Threet had all pled guilty.

The charges against all of the Defendants involve a conspiracy to manufacture marijuana. Those Defendants, with the exception of Salah Dado, were allegedly involved with the physical process of growing and harvesting the marijuana plants from the Corlew's home in northern Michigan.  Defendant Salah Dado was allegedly involved only in the background — investing necessary capital and receiving processed marijuana in return.

Unlike his co-Defendants, Defendant Dado decided to proceed to trial.  A jury of his peers convicted him on all counts, and he now seeks a new trial.  Defendant claims that his trial attorneys did not do their job, and that the government withheld valuable impeachment evidence that could have been used to undermine his accusers.

But there was no misconduct, either by Defendant's trial counsel or the prosecution, warranting a new trial.  Defendant's motion for a new trial will be denied.

# I

During the spring and summer of 2009, Rocky Corlew spent up to sixty hours a week working from home.  Rocky spent his days planting, watering, weeding, and protecting his crop: marijuana.  Rocky grew marijuana to sell for profit, and during 2009 he was the center of a large-scale operation.

On October 13, 2009, Michigan State Police Officers traveled to Rocky's residence, located at 5951 Muma Road, Gladwin, Michigan.  Rocky had been implicated when plots of marijuana were found in the area, and the officers intended to question him about those discoveries.  As the officers approached Rocky's house, they saw two men out front next to parked vehicles.  One man dove under a truck and attempted to conceal himself.  He was later identified as Michael Szemites, Rocky's cousin.  The other man was David Howard, Rocky's brother-in-law.  The officers observed two large black garbage bags at the men's feet.  Stalks and stems protruded from the first, and marijuana was visible inside.  The other held 22 individually-wrapped bags of marijuana.  Officers secured the premises and obtained a search warrant, which was executed that same day.

Over ninety pounds of processed marijuana was confiscated from within the house, the attached garage, and the vehicles parked outside.  That weight did not include the loose marijuana (shake) that was recovered, or the plant stems and leaves that had been removed during processing.  Almost thirteen-hundred marijuana plants were discovered growing in the home, the garage, and scattered among the one-thousand acres surrounding the property.  Police also found cash, numerous firearms, and the tools for growing and processing large quantities of marijuana.

Rocky didn't operate on his own. Numerous arrests resulted from the October 13th raid, and slowly a conspiracy to grow and sell marijuana was unearthed. Rocky's wife, Cory Corlew, had been enlisted to help tend and process the plants. Along with Rocky and Mrs. Corlew — Michael Szemites, David Howard, Eric Schweikert, Tim Bunting, Chris Threet, and Nathan Stover had assisted with maintaining and processing the marijuana at various times. During the course of 2009, they produced between four and five thousand plants.

But this conspiracy went even further, beyond those tending crops in the field and processing the plants once they were harvested. An operation of this magnitude requires capital — money for the tools and equipment necessary to cultivate, harvest, and process thousands of marijuana plants. Rocky estimated that it cost around $15,000 to grow the plants they did in 2009, none of which was his own money. According to Mrs. Corlew, "Rocky didn't have the means or the money to run that grow operation." Trial Tr. Vol. III, at 234. So where did the money come from? "The guys that were growing with [Rocky] were going to contribute what they could . . . And they would get money from Sal . . . ." *Id.* at 189.

Sal is otherwise known as Salah Dado, the defendant in this case. Defendant was a businessman, operating at least one liquor store in Mount Morris Township, Michigan. Defendant and Rocky had met each other at different times over the course of ten years, and for eight years Defendant, Rocky, and Mike Szemites had been conducting marijuana transactions together. Rocky testified that over half of the money used to produce plants in 2009 came from Defendant:

> Q: Where did that money come from?
> A: Come [sic] from Dave, Eric and Mike.
> Q: And was Mike working?
> A: No.
> Q: Who provided the most money?
> A: Mike.

> Q: How much of that fifteen thousand came from Mike?
> A: Eight, probably.

Trial Tr. Vol. IV, at 310–311. When asked where Mike got that money, Rocky responded, "He told me Sal gave it to him." *Id.* at 310.

Rocky also relied on Defendant to buy the finished product. He thought the 2009 crop would yield about "a thousand pounds" of marijuana, and he expected Defendant to buy "most of it." *Id.* at 299, 300. Rocky said he was told Defendant was willing to buy "whatever we had." *Id.* at 319. Of twenty pounds of processed marijuana that had been sold before the police raid in October, Rocky testified, "Mike had taken ten or fifteen, I'm not exactly sure, to Sal." *Id.* at 314. Mrs. Corlew remembered, "Any time I heard Sal's name mentioned, it was either regarding him giving Mikey — Mike and Rocky money . . . for the growth of marijuana or in terms of him buying marijuana that was grown." *Id*. at 219.

As Defendant shared in the operation's success, so he shared in its failure. After the other individuals were arrested and charged in connection with growing marijuana, so too was Defendant. On May 13, 2011, a warrant was issued for his arrest. Less than one year later, on May 2, 2012, a jury convicted Defendant on two charges in connection with that operation to grow marijuana: conspiracy to manufacture, distribute, or possess marijuana with the intent to distribute in violation of 21 U.S.C. § 846, and aiding and abetting the manufacturing of marijuana in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Shortly after the trial's conclusion, Defendant retained new counsel (N.C. Deday LaRene), who first moved to extend the period for filing post-trial motions. The motion was granted in part, extending the period from 14 days (as prescribed by Rule 33 of the Federal Rules of Criminal Procedure) to 35 days.

On June 6, 2012, counsel filed a Motion for New Trial pursuant to Fed. R. Crim. P. 33. The motion rests on two grounds: first, that the government did not comply with its obligation

under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny to disclose material evidence favorable to the accused before trial. Second, Defendant asserts that trial counsel were wholly ineffective, and but for their unprofessional-errors, the result would have been different.

## II

The preliminary inquiry in addressing Defendant's motion is whether the United States failed to comply with its obligations under the *Brady* rule. If so, the next consideration is whether Defendant was prejudiced as a result. To readily decide those questions, a background of the evidence at issue is necessary.

## A

At trial the prosecution called as a witness Jon Abbott, the Defendant's self-proclaimed best friend. Abbott testified that he and Defendant had trafficked marijuana together. Trial Tr. Vol. VI, 556, May 1, 2012. Abbott has known Mike Szemites since high school, and Rocky and Mrs. Corlew for "ten to twelve years, approximately." *Id.* at 558. In early 2009, Abbott learned of the grow operation conducted on Rocky's property through Szemites, and was asked to back the project financially, which he declined to do. *Id.* at 559, 560.

Abbott also testified that during the summer of 2009 he and Defendant had multiple conversations concerning the ongoing marijuana production at Rocky's residence. *Id.* at 562. Abbott said he was encouraged by Defendant to invest in the operation, and indicated Defendant himself had invested at least $1,500 at that point. *Id.* at 562, 563. Abbott testified that Defendant expected to get marijuana in return for his contributions, and claimed that when the operation was discovered and raided by the police, Defendant had already received at least "five and a half pounds" of processed marijuana. *Id.* at 563, 568-69.

Abbott testified that after police uncovered the operation, Defendant advised him not to contact Szemites because things had been "busted up north."  *Id.* at 566.  But according to Abbott, Defendant stuck with the project even then.  Abbot claims that when Eric Schweikert[1] harvested and processed plants police did not find during the raid, Defendant received "a couple pounds" of marijuana from Schweikert, which he subsequently sold.  *Id.* at 567, 568.  Not long after receiving this testimony from Abbott, the jury found Defendant guilty.

Defendant contends the government suppressed valuable evidence that could have been used to impeach Abbott's testimony.  During March of 2011, Abbott was interviewed by agents investigating the case.  Present at the interview were Abbott, his attorney Albert Zerka, Special Agent Robert DeRocher, and Task Force Officer Cedric Kendal.  Agent DeRocher prepared a memorandum concerning the interview, which was not produced to defense counsel before the trial.  Defendant's motion alleges that the memorandum includes information which should have been disclosed under *Brady*, including: "(a) Abbott's making a false accusation regarding the person as to whom he volunteered information, (b) his false claim about S/A's unmade promise of immunity, and (c) his actions in repeatedly and aggressively seeking immunity and/or protection (all while he apparently continued to grow marijuana)."  Def.'s Mot. 7.

Defendant also believes Abbott said something else during the interview that is not in DeRocher's memorandum.  In a signed affidavit, Abbott's attorney Mr. Zerka said that during the interview, Abbott was asked about Defendant's involvement in the marijuana-grow operation.  Def.'s Mot. Ex. 2.  According to Mr. Zerka's recollection, Abbott responded that "he did not know anything about [Defendant] being involved."  *Id*.  Defendant claims, accurately, that this statement would constitute impeachment evidence of Abbott's testimony concerning

---

[1] Eric Schweikert escaped detection during the October 13, 2012 raid of Rocky Corlew's residence by hiding in the woods.  Trial Tr. Vol. V, 457, April 30, 2012.

Defendant's involvement and seriously challenge Abbot's credibility. However, whether Abbott actually made the statement is contested. In a sworn affidavit, DeRocher states that he is confident Abbott never denied Defendant's involvement with the grow-operation. Pl.'s Resp. Ex. 1, at 1.

**B**

Defendant was granted an evidentiary hearing. Originally intended to be concluded with one day, the evidentiary hearing continued to cover three days: September 10, September 24, and November 19, 2012. Over those days, Mr. Zerka, Kenneth Dado, Defendant's trial counsel, Abbott, and Agent DeRocher were all called to the stand.

The first witness, called by the defense, was Albert Zerka. Likely called only to confirm that Abbott made the impeaching statement disavowing Defendant's involvement with the charged crimes, Mr. Zerka's testimony became the focal point of the hearing. As the testimony progressed, the connection between Mr. Zerka and the Defendant became more obvious.

Mr. Zerka is an attorney and a friend of Defendant's family, and he has represented numerous members of the Defendant's family over the years. He lives in the same community, sees them at church, and by his own admission, cares a great deal about them. Defendant sought Mr. Zerka's legal advice concerning the Michigan medical marijuana law within the past two years. Indeed, Mr. Zerka might even have represented Defendant in this case had his services not already been engaged by co-Defendant Szemites, who entered his guilty plea with Mr. Zerka's assistance on February 25, 2011. Mot. Hr'g Tr. Vol. I, at 60–61, ECF No. 360. During Defendant's trial, his wife called Mr. Zerka "each day after – or every couple days after" to tell Mr. Zerka "how things were going." Mot. Hr'g Tr. II, at 151, ECF No. 366. After Defendant

was convicted, Mr. Zerka spoke with Mrs. Dado again because he was "concerned for her family." Mot. Hr'g Tr. I, at 60.

As it turns out, Mr. Zerka had more than a single connection to the associated parties. That is, he was also representing Abbott — the prosecution's star witness — with respect to another controlled substance matter. Not long after Abbott took the stand and unequivocally connected Defendant to Rocky's marijuana growing operation, Mr. Zerka signed an affidavit undermining his testimony. Mr. Zerka claims that he was present during the interview between Abbott and Agent DeRocher in March 2011. According to Mr. Zerka, during the interview Abbott was asked about Defendant's involvement with the grow operation, and Mr. Zerka testified, under oath, that Abbott denied any knowledge of Defendant's involvement. Mot. Hr'g Tr. Vol. I, at 14.

Along with the connection between Mr. Zerka and Defendant's family noted above, the testimony during the hearing demonstrated that Mr. Zerka was further entwined with Defendant and this case. Mr. Zerka, as noted earlier, represented co-Defendant Michael Szemites, who entered his guilty plea on February 25, 2011, but Mr. Zerka was paid by Defendant for those services. Mr. Zerka testified that he was not voluntarily paid and had to visit the Defendant at Defendant's store to collect his fee. Mot. Hr'g Tr. Vol. I, at 68. When asked, in fact ordered, to produce evidence of the dates, amounts, and source of those payments after the first day of the hearing to demonstrate the date they were received in relationship to the dates of the events affecting the Defendant, Mr. Zerka did not comply. And despite the Court's direction, neither did Defendant.

After the second day of the hearing, the Court again ordered Mr. Zerka to produce the following information to determine when he received payments from Defendant:

> written releases, for any bank in which he has a personal or business account, to provide copies of the money orders he received from Defendant . . . his bookkeeper's records used to prepare his financial records for the time period of the payments from Defendant, specifically between October 2009 and October 2011 . . . any information related to third-party negotiation of the payments he received from Defendant.

Sept. 26, 2012 Order 2, ECF No. 364.

After Mr. Zerka was ordered to produce those documents, he drafted an email which he sent to defense counsel and not the Government or the Court. He wrote, "In regard to the money orders that are at issue, I was never tendered money orders by [Defendant] as I had testified in court. I was simply mistaken. . . . I did believe that [Defendant] gave me those but I was wrong." Mot. Hr'g Tr. Vol. III, at 232–33, ECF No. 378. Notably, this was not Mr. Zerka's only mental lapse during the course of the hearing: he testified that his memory is otherwise faulty: "I can't tell you where I was last week and what court to be honest with you." Mot. Hr'g Vol. II, at 117.

Mr. Zerka's testimony covered the entire first day, and most of the second. That was the only evidence defense counsel offered to prove that before trial Abbott denied Defendant's involvement with the grow operation conducted out of Rocky's residence. And this evidence, Mr. Zerka's testimony, was not only unconvincing; it was also directly contradicted.

Agent DeRocher took the stand on the third day and testified that in March 2011, he never questioned Abbott about Defendant's involvement with the marijuana operation. *Id.* at 266. DeRocher indicated that the subject of the interview was Brandon Szemites, Michael Szemites' brother, not Defendant. *Id.* at 265. Agent DeRocher continued that in any event, he would not have asked Abbott about Defendant during the interview:

> At that point, [Defendant] was a target of the – of the case. I did not know Mr. Abbott, only – this was my first meeting with him and I would not have thrown out the target and who I thought was a – at that point, the leader of the organization, I would not have thrown his name out, in effect showing my hand.

*Id*.  Agent DeRocher was simply attempting to determine what Abbott had to say about the case without telling him what was already known.  *Id*.

Jon Abbott also took the stand on the third day of the hearing, and his testimony corroborated Agent DeRocher's testimony exactly.  According to Abbott, during his interview with Agent DeRocher, "Sal Dado's name was never mentioned."  *Id*. at 244.  Abbott did explain why Defendant would have been paying Mr. Zerka for his representation of Michael Szemites:

> Q:    Do you recall [Defendant] saying that he would take care of all of the lawyer fees if all the defendants kept quiet?
> A:    Yeah, but not just due to this case.  This was previous deals if anybody got in trouble.
> Q:    And would you explain what you mean by that?
> A:    Like I had no part in this case but I got in trouble with some weed so, you know, it was supposed to be if I – if everybody didn't say anything, lawyer fees would be taken care of.
> Q:    By [Defendant]?
> A:    Yeah.

*Id*. at 245–46.  Not only did Abbott maintain he never denied Defendant's involvement with the marijuana growing operation, he further tightened the connection between Defendant and Albert Zerka, the man testifying on Defendant's behalf.

## C

Turning to the question raised by Defendant's motion — whether the facts indicate a *Brady* violation has occurred.  In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  The Supreme Court has since held this duty to disclose applies even when there has been no request by the accused, *United States v. Agurs,* 427 U.S. 97, 107 (1976), that the duty encompasses impeachment evidence as well as exculpatory evidence,

*United States v. Bagley*, 473 U.S. 667, 676 (1985), and that the duty even reaches evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitley,* 514 U.S. 419, 437 (1995).

To establish a true *Brady* violation, "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999); *See also United States v. Fort,* 55 F. App'x 222, 224 (6th Cir. 2002) (quoting *Carter v. Bell,* 218 F.3d 581, 601 (2000)).

### D

Defendant asserts four things were suppressed in this case: (1) Abbott's alleged statement during the March 2011 interview that Defendant was in no way involved with Rocky's grow operation; (2) Abbott's accusation during that interview, referenced in DeRosher's memorandum; (3) Abbott's false claim about promises of immunity, referenced in DeRosher's memorandum; and (4) Abbott repeatedly seeking immunity or protection or both, also from DeRosher's memorandum.  Def.'s Mot. 7.  Of these four, the first would clearly be the most damning, and so it is the first to receive attention.

### 1

At the end of the three-day hearing, the Court is left with two credible witnesses, and another who is not.  Abbot and Agent DeRocher told the same story.  They both testified that Defendant's name did not come up during the March 2011 interview, and that Abbott never made any statement denying his involvement in the marijuana grow operation.

On the other hand, Mr. Zerka claimed he remembered Defendant's name arising, and Abbott denying any involvement with that operation.  Mr. Zerka's memory, however, was faulty

on numerous other points.  He made admittedly false statements on the witness stand, and he was so wrapped up with the Defendant's family that it was clear where his loyalty was directed; which, in turn, negated the testimony he provided.  In sum, there are two credible witnesses saying Abbott never denied Defendant's involvement, and one unbelievable witness testifying to the contrary.

Defendant has not demonstrated that the government suppressed Abbott's alleged statement.  In fact, Defendant has not satisfied his burden of showing such a statement was made.  And even assuming Defendant *had* made such a showing, his burden would remain unsatisfied.  Defendant disagrees, contending that if Abbott did disclaim knowledge of Defendant's involvement, "the failure to advise the defense of that fact would loom large indeed."  Def.'s Mot. 8.  This argument lacks one critical element — government knowledge of the statement.  More precisely, if Abbott disclaimed knowledge of Defendant's involvement *and* either the prosecutor or police investigators knew it, *then* non-disclosure would menace Defendant's conviction.  The government has no obligation to disclose unknown facts.

In addition, the Supreme Court in *Kyles*, "the individual prosecutor has a duty to learn of any favorable evidence *known* to the others acting on the government's behalf in the case . . . . the prosecution's responsibility for failing to disclose *known*, favorable evidence rising to a material level of importance is inescapable." 514 U.S. at 437, 438 (emphasis added). *Brady* thus does not impose an affirmative duty upon the government to disclose information which it does not know. *See Hollman v. Wilson,* 158 F.3d 177, 180–81 (3rd Cir.1998) (finding no *Brady* violation where prosecutor, who failed to disclose, had no actual or constructive possession of information).  The prosecution's obligation is to produce evidence "actually or constructively in

its possession . . . ." *United States v. Perdomo*, 929 F.2d 967, 970 (3rd Cir. 1991) (citing *United States v. Auten*, 632 F.2d 478, 480 (5th Cir. 1980)).

Here, even if Defendant could show that Abbott did deny Defendant's involvement, Defendant must also show such a statement was *known* — either to the prosecutor or some other individual acting on the government's behalf in the case. Agent DeRocher's memorandum contains nothing about a statement by Abbott concerning Defendant, and in his affidavit, DeRocher affirmatively disavowed any such statement. Pl.'s Resp. Ex. 1. What the government does not know, it cannot suppress. As such, we need not reach the *Brady* materiality prong for this issue.

**2**

Defendant's second *Brady* violation claim can be similarly dismissed before determining whether the alleged statement prejudiced Defendant. DeRocher's redacted memorandum details the content of his March 2011 interview with Abbott. Def.'s Mot. Ex. 2. According to DeRocher, "[Abbott] said **REDACTED** had burned down his house, collected the insurance money and tried to parlay the insurance money into the Muma Rd Marijuana grow, through his brother **REDACTED** had intentionally poured a bottle of liquor on his computer to start the fire." *Id.* DeRocher went on to say,

> I investigated Abbott's claim, regarding **REDACTED** but could not gather any additional information. The Michigan State Police Fire Marshall could not find any house fires for **REDACTED** or house fires for address I had linked to **REDACTED**. A few months later I called Attorney Zerka, and requested Abbott confirm the address of the House fire. Attorney Zerka called me back and confirmed the address I already had.

*Id.*

Defendant has attempted to whip the government's failure to disclose this entry into an affront to Defendant's constitutional rights, but has provided no substantive argument in support

of his argument aside from the vague assertion it would provide "valuable impeachment." Def.'s Mot. 7. Even so, Defendant has succeeded where he previously met with failure. The statement's existence is not in question, but is recorded in DeRocher's memorandum. It was within the prosecutor's possession, at least constructively, and was not disclosed until after trial. There is little doubt the statement was suppressed.

It has not been shown, however, that the statement was favorable to Defendant's cause. For Abbott's accusation concerning the arson to impeach his credibility — to be of benefit to the Defendant — it must be false, or contradict some other statement he has made. Because the statement is not material to the merits of the case, there is no other way it could favor Defendant. Although Defendant did not advance this argument, it is safe to assume Defendant relies on DeRocher's inability to confirm the accusation as proof of its value for impeachment.

Yet Abbott never contradicted this accusation, nor has it been shown to be false. In fact, DeRocher said quite the opposite in his sworn affidavit,

> As I stated in the summary attached to [Defendant's] motion as Exhibit 2, I contacted the Michigan State Police Fire Marshal for information regarding the arson fire discussed with Mr. Abbott during the March 2011 interview. The Fire Marshal told me that he remembered conducting a fire investigation relating to the person and place at issue, he could remember some details of the case, but he could not locate any records from that investigation. Since the arson was not all that important to my investigation regarding the marijuana conspiracy, and the person who was alleged to be responsible for the fire ultimately was not charged in the marijuana case, I did not pursue the matter further.

Pl.'s Resp. Ex. 1, at 2. Because Abbott's accusation was never contradicted, indeed was later supported, it does not impeach his testimony and thereby favor Defendant. The government's failure to disclose the evidence does not support a *Brady* violation. Neither can DeRocher's failure to investigate the matter further be the basis for a *Brady* challenge. "*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information

which it does not possess." *United States v. Graham,* 484 F.3d 413, 417 (6th Cir.2007) (internal quotation marks and citation omitted).  As with Defendant's first claim, the issue of prejudice need not be reached here.

**3**

Defendant's next allegation does satisfy the first two requirements for a *Brady* violation. DeRocher's memorandum explicitly affirms Abbott falsely claimed he was promised immunity. "I was notified by FANG Lt. Rampy, that Abbott claimed I promised him immunity.  I told Lt. Rampy that was not true."  Def.'s Mot. Ex. 2.  Such a statement bears directly on Abbott's credibility, and would have been a useful source of impeachment at trial.  Additionally, the statement was undoubtedly in the government's possession.  In regard to this statement, the government has suppressed favorable evidence.

But Defendant cannot demonstrate prejudice.  As the Supreme Court explained, "There is never a real *Brady* violation unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler*, 527 U.S. at 281 (internal quotation marks omitted).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Id*. at 289–90 (quoting *Kyles*, 514 U.S. at 434).

While Abbott's false claim could have impeached his credibility at trial, the inclusion of that evidence would not have led a to different result.  It has not been shown that Abbott lied about his involvement with Defendant; his only falsehood concerns whether or not he was promised immunity for testifying.  Because Abbott's testimony concerning the material issues of the case — Defendant's involvement with the marijuana conspiracy — were adequately and

consistently corroborated at trial and during the latter hearing, it cannot be said the suppression of this peripheral evidence prejudiced Defendant. Defendant's *Brady* claim is therefore without merit.

**4**

Defendant's final claim is that the government should have disclosed information concerning Abbott "repeatedly and aggressively seeking immunity and/or protection." Def.'s Mot. 7. The issue of impeachment with immunity typically involves situations where immunity has been granted, not simply requested. Nevertheless at least one district court has found the request itself relevant. The court wrote in *United States v. Livoti*, 25 F. Supp. 2d 390, 394 (S.D.N.Y. 1998) (citation omitted), "the Government questioned [witness] only about his demand for immunity before agreeing to testify at prior proceedings. Such a grant of immunity was relevant to the jury's evaluation of the witness' credibility." Erring on the side of acknowledging that such information was favorable and suppressed, it remains immaterial evidence so that Defendant was not prejudiced by its absence.

Abbott's requests would only have been useful to illustrate his bias for testifying, but this avenue was explored. Defense counsel at trial ended Abbott's cross-examination with the following exchange:

> Q:    Okay. And in fact, you were to cooperate in this case or let's say the case up north, is that a fair statement?
> A:    I — I guess so.
> Q:    And the case that you say that is still under investigation, you hope that will go away based upon your cooperation in this case, is that a fair statement?
> A:    Yes.

Trial Tr. Vol. VI, 595. Defense counsel attacked Abbott's motive for testifying by establishing he exchanged his testimony, in part, for something that he hoped for. Abbott's requests for immunity are no different. "[W]here the undisclosed evidence merely furnishes an additional

basis on which to challenge a witness whose credibility has already been shown to be questionable . . . the undisclosed evidence may be cumulative, and hence not material." *Robinson v. Mills*, 592 F.3d 730, 736 (6th Cir. 2010) (quoting *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000)).   The additional impeachment concerning Abbott repeatedly requesting immunity and protection, even doggedly doing so, would not have changed this trial's result, and as such, is not material.

It is important to note that in assessing *Brady* materiality, a court "must consider the effect of the suppressed evidence 'collectively.'" *Jalowiec v. Bradshaw*, 657 F.3d 293, 313 (6th Cir. 2011) (quoting *Cone v. Bell*, 556 U.S. 449, 474 (2009)).   One demonstrates a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Taken together, Abbott's repeated requests for immunity and false statement concerning promises of immunity could not reasonably undermine confidence in the jury's verdict, individually or collectively.   As previously discussed, Abbott was cross-examined concerning his bias to testify in this case, albeit without the evidence contained in DeRocher's memorandum. His testimony concerning Defendant's financial contributions to the marijuana operation, and later receipt of processed marijuana, were corroborated by other witnesses throughout trial. Therefore, Defendant's *Brady* violation claims lack merit, and do not support the need for a new trial.

### III

The second issue Defendant relies on in demanding a new trial concerns counsel for the trial already conducted. Defendant maintains their performance denied the Sixth Amendment

guarantee of effective assistance of counsel.  Def.'s Mot. 9.  Although it is clear Defendant was represented at trial,

> That a person who happens to be a lawyer is present at trial alongside the accused . . . is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.

*Strickland v. Washington*, 466 U.S. 668, 685 (1984).

## A

Defendant argues that defense counsel at trial, through "notable lapses in their performance," Def.'s Mot. 9, n.2, failed to play their role.  Defendant raises four examples to support this assertion.

First, Defendant points to the fact that defense counsel did not call Kenneth Dado to testify.  At trial, the prosecution introduced evidence that was recovered from Defendant's liquor store on Clio Road when Defendant was arrested: marijuana, a digital scale, and a loaded semi-automatic handgun.  Trial Tr. Vol. V., at 420, 435, 436.  While Defendant was not charged with possession of the weapon, testimony at trial did associate firearms and drug trafficking.  Trial Tr. Vol. VI, at 623–24.  Additionally, during closing argument, the prosecutor noted similarities between the digital scale found in Defendant's store and the digital scale found in Rocky's garage.  Trial Tr. Vol. VII, at 711.  The prosecutor claimed these similarities were not coincidence, arguing Rocky and Defendant were "involved in the same operation."  *Id.*

Kenneth Dado, Defendant's cousin, was willing to testify at trial on Defendant's behalf.  As established by his signed affidavit, Kenneth Dado was employed at Defendant's store, Liquor Cave, when Defendant was arrested and the store was searched.  Def.'s Mot. Ex. 3.  Kenneth testified that the gun found at the store was his, and registered to him, though no such

documentation was produced.  *Id*.  The marijuana that was found was also his, possessed legally under the Michigan Medical Marijuana Act.  *Id*.  Kenneth claimed the scale belonged to him as well.  *Id*.  Kenneth asserted that he told officers that searched the store all of this information, and related the same to Defendant's attorneys before trial.  During the hearing on November 19, 2012, Kenneth Dado confirmed all of the foregoing information from the stand.  Defendant believes the failure to call Kenneth to testify as such during the trial constitutes ineffective assistance.

The second issue Defendant raises to support his ineffective assistance claim is counsel's failure to object to evidence presented through Richard Anderson.  Def.'s Mot. 12.  Richard Anderson was in the same Clare County jail-cell used to hold Rocky Corlew and Michael Szemites following their arrests in this case.  Anderson testified that he spoke to both Rocky and Szemites about their marijuana grow operation.  Trial Tr. Vol. VI, at 539.  According to Anderson, Rocky and Szemites indicated they had a potential buyer for $3,000 a pound.  *Id*. at 540.  Although Anderson never heard the buyer's name, he claimed he was told the buyer owned liquor stores in Flint.  *Id*.  The prosecution also introduced a 2009 letter written by Anderson with similar details.  *Id*. at 543.  Defendant argues counsel's failure to object to this evidence constitutes ineffective assistance.

Third, Defendant claims trial counsel was ineffective when they did not object to opinion testimony from DEA Special Agent Chris Scott.  Def.'s Mot. 13.  Special Agent Scott is the "domestic cannabis eradication coordinator in the State of Michigan," Trial Tr. Vol. VI, at 610, and gave testimony concerning the workings of drug operations.  Scott testified, "A lot of times, the top guys will have a hands-off approach to the organization. You know, they won't come near the grow house . . . [they] stay up at the top directing, never ever having to touch the

product."  Trial Tr. Vol. VI, at 622–23.  Defendant claims this testimony was both inadmissible and highly damaging, and lists its admission without objection as the third example of ineffective assistance.

Finally, Defendant claims trial counsel fell short of constitutional demands a fourth time when they inadvertently opened the door to evidence that had previously been prohibited by the Court.  While questioning Cory Corlew, prosecution sought to elicit testimony concerning a marijuana transaction between Rocky, Michael Szemites, and Defendant that took place in 2004. Defense counsel objected, and given the lapse between that transaction and the 2009 operation, the Court deemed it inadmissible.  Trial Tr. Vol. III, at 197–98.

Then, during cross-examination, defense counsel proceeded to question Mrs. Corlew about her husband Rocky's limited prior relationship.  *Id*. at 206–07.  This was presumably done to highlight the tenuous nature of the contact between Mr. Corlew and Defendant, and undermine her testimony concerning Defendant's involvement with the 2009 marijuana production.  Once the defense had left the jury with the impression that Defendant had little, if any, involvement with Mr. Corlew, the Court allowed the introduction of the evidence that was originally excluded.  On redirect, Mrs. Corlew testified that in 2004, "Sal brought a large bag, like the one you have here, of marijuana" and delivered it to Rocky and Szemites.  *Id*. at 241.  Defendant identifies this incident as the fourth example highlighting trial counsel's deficiencies.

**B**

To decide whether Defendant's ineffective assistance of counsel claims have merit, the familiar two-prong test set forth in *Strickland v. Washington* guides our analysis.  *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005).  The first prong requires Defendant to prove that his trial counsel's representation was deficient; that it "fell below an objective standard of

reasonableness." *Strickland*, 466 U.S. at 688.  We must "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged conduct might be considered sound trial strategy." *Id.* at 689.  As noted by the Sixth Circuit:

> Indicia of objective unreasonableness include the violation of "certain basic duties" inherent in the representation of a criminal defendant, among them a "duty of loyalty" to the client, from which derive "the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution."

*Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997) (quoting *Strickland,* 466 U.S. at 688).  In assessing deficient performance, "reviewing courts must take care to avoid 'second-guessing' strategic decisions that failed to bear fruit." *Lundgren v. Mitchell*, 440 F.3d 754, 769–70 (6th Cir. 2006) (quoting *Strickland*, 466 U.S. at 689).

If Defendant is successful in proving deficient performance, he must then demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of [his trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.  "Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Hughes*, 505 F.3d 578, 597 (6th Cir. 2007) (quoting *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir. 1983)).  When assessing prejudice, a court "must consider the totality of the evidence before the jury . . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695.  It follows that the examination involves "the combined effect of all acts of counsel found to be constitutionally deficient, in light of the totality of the evidence in the case." *Lundgren*, 440 F.3d, at 770.  If the defendant fails to

prove either deficiency or prejudice, then the defendant's ineffective assistance of counsel claims fail. *Id.  See also Strickland*, 466 U.S. at 697.

**C**

**1**

The first issue requiring consideration is whether trial counsel's decision not to call Kenneth Dado meets the *Strickland* test outlined above.  When subjected to that scrutiny, Defendant's claim ultimately falls short.

Defendant asserts that calling Kenneth Dado would have "effectively blunted" the impact of the gun, scale, and drugs found in Defendant's store at the time of his arrest.  Def.'s Mot. 11. According to Defendant, it follows that failing to call Kenneth Dado was deficient representation. In support, Defendant provides only one case concerning the failure to call a witness and ineffective assistance of counsel, and in so doing, misstates the case's applicability. In *Towns v. Smith*, defense counsel failed to investigate a "known and potentially important witness."  395 F.3d at 259 (quoting *Blackburn v. Foltz*, 828 F.2d 1177, 1183 (6th Cir.1987)). The court held it was objectively unreasonable for counsel to decide not to call the witness "without first investigating [him], or at least making a reasoned professional judgment that such investigation was unnecessary." *Towns*, 395 F.3d at 260.

The facts here are different.  Defendant's trial counsel, Christopher McGrath, interviewed Kenneth Dado before trial.  McGrath Aff., at 1, ECF No. 349.  Mr. McGrath and Kenneth Scott, Defendant's other attorney, considered calling Kenneth Dado to testify, but reasoned the ample opportunity for cross-examination that would be extended to the government outweighed the positive results his testimony would bring.  *Id*. at 2.  Counsel also discussed the possibility of presenting witnesses with Defendant before the close of evidence and had frequent discussions

about which witnesses to call.  Trial Tr. Vol. VI, at 634;  McGrath Aff. at 2, Scott Aff. At 2.
Accordingly, counsel did not fail in that basic duty outlined by *Rickman v. Bell*.  It is not for this
Court to second-guess their strategic decision.

For not calling a witness to amount to an error of constitutional magnitude, the omission
must result in exculpatory evidence being ignored.  "[A]n attorney's failure to present available
exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration
justified it."  *Caldwell v. Lewis*, 414 F. App'x 809, 815–16 (6th Cir. 2011) (quoting *Pavel v.
Hollins*, 261 F.3d 210, 220 (2d Cir. 2001)).  But "[a] defense counsel has no obligation to call or
even interview a witness whose testimony would not have exculpated the defendant."  *Pillette v.
Berghuis*, 408 F. App'x 873, 884 (6th Cir. 2010) (quoting *Millender v. Adams*, 376 F.3d 520, 527
(6th Cir. 2004)).

Although Kenneth Dado would have taken responsibility for the weapon, drugs, and scale
in Defendant's liquor store (though he produced no documentary evidence during the evidentiary
hearing conducted to address Defendant's motion for a new trial), that is not the type of evidence
that would raise reasonable doubts as to Defendant's guilt in this case.  Kenneth Dado did not
say he would testify Defendant was *not* involved with Rocky's 2009 marijuana production.  He
did not say he would testify Defendant did *not* inject money into the operation; that Defendant
did *not* purchase the processed marijuana that resulted.  Likewise, while Kenneth Dado's
testimony may have blunted some of the circumstantial evidence against Defendant, he certainly
could not have exculpated Defendant from the crimes for which he was convicted by the jury.
Therefore, counsel's decision to not call Kenneth Dado was not constitutionally deficient
performance.

**2**

Next, Defendant points to two situations where the prosecution admitted evidence without objection. Defendant claims both situations amount to ineffective assistance of counsel, and advances *Hough v. Anderson*, 272 F.3d 878, 898 (7th Cir. 2001), for the proposition that "an ineffective assistance claim based on a failure to object is tied to the admissibility of the underlying evidence." While that is true, the case did not declare that the failure to object to inadmissible evidence automatically constitutes ineffective assistance. To the contrary, the case went on to discuss only the applicability of *admissible* evidence and its bearing on the failure to object. "If evidence admitted without objection is admissible, then the complained of action fails both prongs of the *Strickland* test." *Id*.

Concerning the failure to object to inadmissible evidence, "[T]he Constitution does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Lundgren*, 440 F.3d, at 774 (quoting *Engle v. Isaac,* 456 U.S. 107, 134 (1982)).

> Moreover, experienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. Learned counsel therefore use objections in a tactical manner. In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.

*Lundgren*, 440 F.3d at 774.

Defendant's counsel did not so consistently fail to use objections that withholding objections in the two complained-of situations could not have been strategic. The record is replete with defense counsel's objections. That being the case, each alleged deficiency is assessed with the mindset that a single failure to object is not error unless "the evidence sought is so prejudicial to a client that failure to object essentially defaults the case to the state."

*Lundgren*, 440 F.3d, at 774.  Further, if the evidence was in fact admissible, it fails the *Strickland* test outright.

**a**

The first situation Defendant advances is the testimony of Richard Anderson.  Because Anderson's testimony would have been properly admitted even over a defense objection, Defendant's contention on this point fails.

Defendant claims Anderson's testimony was not admissible because defense counsel did not charge, explicitly or impliedly, that Rocky had recently fabricated his story concerning selling marijuana to Defendant.  Additionally, Defendant asserts that Rocky's motive to fabricate attached before his jail-cell conversations with Anderson.  Either way, Defendant argues that Anderson's testimony was not admissible pursuant to Fed. R. Evid. 801(d)(1)(B).  But both contentions are off the mark.

During Rocky's cross-examination, defense counsel did endeavor to undermine his testimony regarding the sale of processed marijuana to Defendant, implying that his version of events was false.  Specifically, Rocky was asked whether the marijuana was really going to sell for $3,000 a pound.  Trial Tr. Vol. IV, at 338.  Counsel went on to conduct the following exchange:

> Q:   And the conversation was, is that Mike told you and Dave that if y'all would give him your all share of the marijuana, he would be able to sell it to [Defendant], correct?
> A:   Yes.  He — he owed him.
> Q:   And did you call [Defendant] to find out if in fact that line that Mike gave you was true?
> A:   No.
> Q:   Did you ever talk to [Defendant] to find out if in fact what Mike had told you was true?
> A:   No.

Trial Tr. Vol. IV, at 341–42. Counsel then further undermined Rocky's testimony by suggesting that he didn't like Defendant, referencing derogatory labels Rocky had applied to Defendant during questioning in 2011. Trial Tr. Vol. V, at 409–410. Finally, Counsel questioned Rocky about his plea agreement. *Id.* at 364–66. Rocky was asked, "so you're here testifying because you want something, is that correct?" *id.* at 366, and, "in fact, you would do almost anything for freedom, is that a fair statement?" *Id.* All of this testimony, taken together, was defense counsel's attempt to discredit Rocky's testimony that Defendant was the intended recipient for processed marijuana.

This implication that Rocky had fabricated his story provided the government the opportunity to respond. As determined by *United States v. Argo*, 23 F. App'x 302, 308 (6th Cir. 2001), when defense counsel implies a witness has fabricated testimony in exchange for a favorable plea agreement, a prior consistent statement "made before the plea agreement was negotiated is admissible under Rule 801(d)(1)(B)." *See also United States v. Toney*, 161 F.3d 404, 408 (6th Cir. 1998). In this case, Rocky's plea agreement was executed on February 4, 2011. ECF No. 142. The conversation with Anderson took place in November of 2009. Rocky's prior consistent statements concerning selling marijuana for $3,000 a pound to a man who owned liquor stores was therefore admissible to rebut the charge of improper motive created by counsel's cross-examination.

Even if the evidence was not admissible, counsel's failure to object still would not equate ineffective assistance. Anderson's testimony that Rocky and Szemites had a buyer who owned liquor stores is not so prejudicial the failure to object "essentially defaults the case to the state." *Lundgren*, 440 F.3d at 774. This lack of prejudice stems from the fact that three different witnesses had already testified Rocky and Szemites planned to sell marijuana, at $3,000 a pound,

to a buyer who owned liquor stores. Trial Tr. Vol. III, at 195–96; Trial Tr. Vol. IV, at 299, 310; Trial Tr. Vol. V, at 459. The additional testimony from one other witness would not, therefore, default the case to the state.

**b**

Defendant also claims defense counsel's failure to object to Special Agent Scott's testimony concerning drug operations was deficient. Defendant is ultimately incorrect. Special Agent Scott's testimony was admissible under Federal Rule of Evidence 702. "Under Federal Rule of Evidence 702, a person with 'specialized knowledge' qualified by his or her 'knowledge, skill, experience, training, or education' may give opinion testimony if it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *United States v. Johnson*, 488 F.3d 690, 698 (6th Cir. 2007) (quoting Fed. R. Evid. 702).

In *Johnson*, it was admissible for a police officer to give opinion testimony of how drug traffickers interact based on his training and experience. 488 F.3d at 698. There, the Sixth Circuit noted, "Courts generally have permitted police officers to testify as experts regarding drug trafficking as long as the testimony is relevant and reliable." *Id. See also United States v. Lopez–Medina*, 461 F.3d 724, 742–43 (6th Cir. 2006). The court went on to explain,

> There are innumerable trades and practices that employ their unique devices, feints, and codes that may mean nothing to the untrained observer but may speak volumes to a maven qualified by experience or training. The illegal drug trade certainly fits into that category. "Our court regularly allows qualified law enforcement personnel to testify on characteristics of criminal activity, as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the understanding of the average layman."

*Johnson*, 488 F.3d at 698 (quoting *United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004)). As noted in the government's response to Defendant's motion for a new trial, Special Agent Scott's testimony "was properly tailored to the evidence presented during the trial and

coupled with an appropriate jury instruction." Pl.'s Resp. 3. His testimony was highly relevant to the case, helpful to the jury, and appropriately reliable. Not objecting to such testimony is not the kind of deficient performance the *Strickland* test is designed to root out.

**3**

Finally, Defendant claims counsel performed ineffectively when they inadvertently opened the door to previously excluded testimony concerning 2004 transactions between Defendant, Rocky, and Michael Szemites. This argument is unpersuasive.

Upon Mrs. Corlew's direct examination, the Assistant United States Attorney reached a point where she wished to introduce evidence concerning past dealings between Defendant, Rocky Corlew, and Michael Szemites. She inquired with the Court before doing so:

| | |
|---|---|
| Ms. Parker: | Judge, there is one other matter I need to take up at a sidebar before I go any further. |
| (At sidebar) | |
| Ms. Parker: | This is one of the 404(b) issues that we discussed on Monday. I believe this witness will testify that on one occasion, before they moved up north, she and her husband were at Michael Szemites' house and Mr. Dado showed up with a hockey bag and left without a hockey back and when he was gone, there was a large quantity of marijuana. |
| The Court: | What time period? |
| Ms. Parker: | I think she will say around 2004 but I will admit she is a little fuzzy on that. |
| Mr. McGrath: | That's four years before they moved up to Muma – well, three years, three and a half years before they moved up to Muma Road. |
| The Court: | I think it's out. |
| Ms. Parker: | Okay. That's why I wanted to check before I asked. |
| The Court: | All right. Thank you. |

Trial Tr. Vol. III, at 197–98. At that point, the witness was passed for cross-examination.

During defense counsel's cross-examination of Mrs. Corlew, he attempted to undermine her testimony, and Defendant's involvement with the grow-operation, by showing that Mr. Corlew had only attenuated contact with the Defendant:

Q:      When is the last time you saw or had any – before today, when is the last
        time you saw or had any contact with Salah Dado?
A:      The night of Mike Szemites' father's funeral.
Q:      When was that?
A:      The day.  I don't recall the date.
Q:      How about the year?
A:       I believe it was 2008.
Q:      2008?
A:      I believe so.
Q:      You saw Sal Dado that night?
A:      I saw him at the funeral, yes.
Q:      Was there any discussion of marijuana or anything of that sort at the
        funeral?
A:      No, there wasn't.
Q:      Before that, when is the last time that you had any type of contact –
        whether seeing him or talking to him, when is the last time that you had
        any contact with Mr. Dado?
A:      Probably four years before that, at dinner.
Q:      2004?
A:      Yes, I believe so.

*Id*. at 205–06.   Defense counsel continued his cross-examination, attempting to show that

Defendant had no contact with the marijuana grow operation, and Mrs. Corlew had no personal

knowledge of any involvement on his part:

Q:      What do you mean the growth of the marijuana?  How did Sal work into
        the growth of the marijuana, ma'am?
A:      Because I – I'm under the understanding that that's where Mike and my
        husband got the money for some of that.
Q:      You're under the understanding but you don't have any personal
        knowledge about that, do you, Ms. Corlew?
A:      Not other than what I heard them say.
Q:      Did you hear at any time Rocky say that he personally talked to Sal?
A:      No, I didn't

*   *   *   *   *

Q:      We will get to that in a minute but what was the extent of Sal's business
        with Mike and Rocky in 2008 and 2009, if you know?
A:      The buying and growing of marijuana is my extent of knowledge.
Q:      The buying and growing?  So you're saying that Sal was up there at Muma
        Road helping to grow?
A:      No, he wasn't.  I was told that he funded some of that grow operation.
Q:      How many times was Sal up in Muma Road in 2008?

- 30 -

> A:    Never.
> Q:    How many times was he up there in 2009?
> A:    Never.
> Q:    So it all goes back to money, right?
> A:    Correct.
> Q:    And you have no idea whether or not Sal actually gave money to Mike, right?
> A:    That's what I was told.
> Q:    Right. But you never witnessed anything, did you?
> A:    I didn't.

*Id.* at 219, 223. Finally, defense counsel attacked Mrs. Corlew's belief that her husband and Defendant were involved in marijuana dealings together.

> Q:    You testified to the Grand Jury that you weren't real sure whether or not your husband had business dealings in terms of marijuana with Sal, is that correct?
> A:    I did.

*Id.* at 233–34. After counsel concluded his cross-examination, the Court asked for redirect. At that time, the prosecuting attorney requested a sidebar:

> (At sidebar)
> Ms. Parker:    I just – I believe Mr. McGrath has opened the door for redirect as to why she thought Mr. Dado was involved in drug trafficking with Rocky.

> \*   \*   \*   \*   \*

> The Court:    It's wide open. He went back to it a second time.
> Ms. Parker:    Exactly.
> The Court:    I think she gets – she gets to – gets a record of the earlier transaction. The door is open.

*Id.* at 236, 238. Upon redirect, the prosecutor then asked Mrs. Corlew about the 2004 transaction between Rocky and Defendant.

> Q:    And you were under oath when you were in front of the Grand Jury?
> A:    Yes.
> Q:    And at that time, you were asked about any drug dealings between Mr. Dado, Mike Szemites and your husband.
> A:    Yes.
> Q:    And were you able to describe an incident where you saw certain things?

    A:     Yes.

    Q:    That led you to the conclusion that there was drug dealings between them?

    A:     Yes.

    Q:    Can you tell us what you saw?

    A:     I recall being at my husband's house and I don't – let me rephrase.  I'm not sure if it was my husband's house that I spoke about that time or Mike Szemites' house, Sal brought a large bag, like the one you have here, of marijuana to Mike and left and then my husband and Mike had had [sic] a transaction.

    Q:    When you say they had a transaction, what did you see in that regard?

    A:     I seen my husband get marijuana from Mike Szemites.

    Q:    And was there any marijuana available before Mr. Dado came over with the hockey bag?

    A:     No, there wasn't.

*Id*. at 240–41.  Defense counsel's attempt to undermine Defendant's involvement in this way was a legitimate objective for cross-examination accompanied by a reasonable strategic risk.  The testimony counsel solicited, in the Court's view, left a sufficient impression that Defendant and Mr. Corlew had little contact — let alone a prior business relationship — making the 2004 transaction, which was previously ruled inadmissible, admissible.  It is possible that a different Court would have reached an alternate conclusion.

Defendant believes that defense counsel opening the door to the testimony concerning prior dealings between Rocky, Mr. Szemites, and Defendant constitutes ineffective assistance of counsel.  Defendant relies on *White v. Thaler*, 610 F.3d 890 (5th Cir. 2010), to show that opening the door to previously inadmissible testimony constitutes ineffective representation.  That case, however, is highly distinct from the issues here.  There, counsel's failure opened the door to evidence that was used to crush the defendant's case:

> [T]he prosecutor verbally pounded [defendant] with his failure to tell the police his exculpatory version of the events.  It is apparent that the prosecutor was mocking [defendant's] testimony that the crowd had made him fear for his life.  Counsel's opening the door to this testimony allowed the prosecutor to impeach [defendant] with his silence as if it constituted prior inconsistent conduct.  Further, during closing argument, the prosecutor relied on [defendant's] post-arrest silence to argue that [defendant] was not credible.  The principal issue at

> trial was [defendant's] intent at the time of the offenses.   Thus, [defendant's] credibility was the key to his defense that it was an accident.

*Id.* at 900.   In this case, counsel opened the door to evidence that indicated Defendant was involved with marijuana transactions in 2004.   This evidence did not have the destructive effect of counsel's mistake in *White*.   There was ample evidence throughout the trial that Defendant was involved with drug trafficking at one time or another.   Rocky testified that he, Defendant, and Szemites had been involved with trafficking marijuana for eight years.   Trial Tr. Vol. III, at 309.   Defendant's best friend, Abbott, testified that he and Defendant had trafficked marijuana together.   Trial Tr. Vol. VI, at 556.   Marijuana was discovered in Defendant's store and in his car.   Trial Tr. Vol. V, at 420–21.   With this evidence of Defendant's involvement with marijuana and drug trafficking, counsel opening the door to one additional incident, compromising only seven questions, is simply insufficient to show prejudice; that but for those few lines, this trial would have ended differently.   It follows that Defendant's final ineffective assistance of counsel claim has no merit.

None of Defendant's claims for ineffective assistance of counsel individually withstand the application of the *Strickland* test, and he has not demonstrated any prejudice that may have ensued from all four together.   We therefore find that Defendant's claims concerning ineffective assistance of counsel is without merit.

### IV

Accordingly, it is **ORDERED** that Defendant's Motion for a New Trial, ECF No. 340, is **DENIED**.

Dated: January 17, 2013

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

- 33 -

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 17, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS